170 F.3d 311
 Paul AMATO, Plaintiff-Appellant,
v.
CITY OF SARATOGA SPRINGS, NEW YORK, Saratoga Springs Police
Department, Robert Flanagan, Srgt., also known as Sergeant
Flanagan, John Doe, Lynn Thomas, Lt., Karyn L. Thomas, as
Personal Representative of Lynn Thomas, Deceased, Kenneth E.
King, Chief, Lewis J. Benton, III, Commissioner and Karyn L
Thomas, as Personal Representative of Lt. Lynn Thomas,
Deceased, Defendants-Appellees.
 Docket No. 97-9623.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 13, 1999.
Decided March 15, 1999.
 
 1
 David Brickman, Albany, NY, for Plaintiff-Appellant.
 
 
 2
 Veronica O'Dell, Glens Falls, NY, for Defendants-Appellees, City of Saratoga Springs, Saratoga Springs Police Department, Lt. Lynn Thomas.
 
 
 3
 John H. Pennock, Jr., Clifton Park, NY, for Defendant-Appellee, Kenneth E. King.
 
 
 4
 Before: JACOBS and SOTOMAYOR, Circuit Judges, and SAND,* District Judge.
 
 
 5
 Judge JACOBS concurs in a separate opinion.
 
 SAND, District Judge:
 A. Procedural Background
 
 6
 Following a post-arrest altercation with police, plaintiff-appellant Paul Amato ("Amato") brought this action pursuant to 42 U.S.C. §§ 1983 and 1988 against the City of Saratoga Springs ("City"), the Saratoga Springs Police Department ("Police Department"), the police chief, Kenneth King ("King"), the police commissioner, Lewis Benton III ("Benton"), Sgt. Robert Flanagan ("Flanagan"), and Lt. Lynn Thomas ("Thomas")[1].
 
 
 7
 In a Memorandum, Decision and Order, dated July 10, 1997, Chief Judge Thomas J. McAvoy of the United States District Court for the Northern District of New York granted summary judgment to King and Benton in their personal capacities, and dismissed any action against them in their official capacities as duplicative of Amato's claim against the City and the Police Department. In the same decision, the district court also bifurcated for trial the proceedings against Flanagan and Thomas, the two police officers personally involved in the altercation, from the proceedings against the City and the Police Department.
 
 
 8
 Following a four-day trial on Amato's claims against Flanagan and Thomas, the jury found Flanagan liable for use of excessive force during the incident and Thomas liable for his failure to intervene in the altercation. The jury awarded Amato no compensatory damages, but did award him nominal damages in the amount of one dollar, and punitive damages against Flanagan.[2] After the jury verdict, the district court denied Amato's post-trial motions. The court also dismissed Amato's claim against the City and the Police Department from the bench without any recorded explanation.
 
 
 9
 On appeal, Amato contends that the district court erred by: (1) failing to grant him a new trial on the issue of damages following the jury's award of no compensatory damages; (2) bifurcating the proceedings; (3) dismissing the claim against the City and the Police Department; and (4) granting summary judgment to King. We affirm in part, vacate in part and remand to the district court for reconsideration consistent with this opinion.
 
 B. Factual Background
 
 10
 On May 26, 1994, Amato was arrested following a disturbance at his father's pizzeria restaurant. He was brought to the Saratoga Springs police station and handcuffed by one hand to the booking room counter. During the booking process, an altercation took place between Amato, and police officers Thomas and Flanagan. The altercation, much of which was recorded on videotape, gave rise to this action.
 
 
 11
 Although some aspects of the incident are in dispute, many of the basic facts are uncontested. During the process of booking Amato on charges of disorderly conduct, Thomas reached across the booking room counter and slapped Amato on the side of the head. Very soon thereafter, Flanagan entered the booking room area and grabbed Amato. While maintaining his hold on Amato, Flanagan yelled at him, and after a period of time, released him. Amato, whose back had been to the wall, slid down to the floor, where he remained for a few minutes.
 
 
 12
 While these basic facts are not in dispute, at trial, the parties presented contradictory evidence as to the nature and extent of the altercation. Amato testified that Flanagan had choked him and slammed him into the wall, while Flanagan testified that he grabbed Amato only by the jaw, and that Amato had backed up against the wall himself. Furthermore, Amato presented evidence suggesting that he had fallen to the ground unconscious, while other witnesses testified that Amato had been conscious and kicking while he was on the floor. The videotape, which was shown to the jury, depicted most of the incident, although the image of Amato while on the floor was out of camera range.
 
 
 13
 Following the incident, Amato did not file a personnel complaint with the Police Department. His criminal defense lawyer did, however, request a copy of the videotape that depicted the incident. At that point, King, the police chief, began an investigation of the altercation. King eventually concluded that no police misconduct had occurred.
 
 DISCUSSION
 
 14
 A. Trial Court's Denial of a New Trial on Damages
 
 
 15
 Amato contends that the trial court erred by failing to grant a new trial on damages when the jury made a finding of excessive force, yet did not award compensatory damages. On review of such claims, appellate courts must afford the jury's findings and the district court's decision great deference. We will reverse only if the district court's decision not to grant a new trial constitutes an abuse of discretion. See, e.g., Atkins v. New York City, 143 F.3d 100, 102 (2d Cir.1998). "A motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." Id. (quoting Lightfoot v. Union Carbide Corp., 110 F.3d 898, 911 (2d Cir.1997) (omitting internal notations and quotations)). Furthermore, we review all evidence in the light most favorable to the nonmoving party. See, e.g., id.
 
 
 16
 As a preliminary matter, we note that a jury finding of excessive force does not automatically entitle a claimant to compensatory damages as a matter of law. See id. at 103. In certain circumstances, a jury could reasonably determine that compensatory damages are inappropriate even where excessive force was used. See, e.g., Haywood v. Koehler, 78 F.3d 101, 104 (2d Cir.1996) ("[W]e have ruled that a finding of excessive force does not, as a matter of law, entitle the victim to an award of compensatory damages."). For instance, where a victim's claims of injury lack credibility, or where the injuries lack monetary value, a jury could reasonably award nominal damages. See, e.g., Briggs v. Marshall, 93 F.3d 355, 360 (7th Cir.1996). Second, where both justified and unjustified force were used, the jury could conclude that the injuries resulted from the justified use of force. See, e.g., Gibeau v. Nellis, 18 F.3d 107, 110 (2d Cir.1994).
 
 
 17
 After examining the evidence presented to the jury at trial on the issue of compensable injury, we cannot conclude that the jury's decision to award Amato nominal damages was seriously erroneous or a miscarriage of justice.
 
 
 18
 Amato testified that he suffered numerous injuries as a result of the booking room incident. These alleged injuries ranged from fairly immediate problems, such as a sore wrist, stiff and bruised neck, headache and swollen shoulder, to more long-term problems such as paranoia, loss of libido, loss of memory and mathematic ability, trouble sleeping, depression, digestive problems, loss of appetite, and aggressive behavior. Amato's wife corroborated many of these complaints through her testimony at trial. Amato also presented the testimony of two non-treating doctors, one neurologist and one neuropsychologist, who opined that Amato suffered from postconcussive injury and dysthemia.
 
 
 19
 The most pertinent piece of evidence, which was shown several times during the course of the trial, was the videotape of the booking room incident. This tape showed Flanagan's physical interaction with Amato, as well as Amato's reaction and demeanor a few minutes following the event.[3] As disturbing and excessive as the jury may have found Flanagan's behavior, the jury could reasonably have concluded that the interaction as depicted in the tape did not lead to any physical injury to Amato. While the actions of Flanagan--yelling, grabbing, possibly shoving Amato into the wall--were clearly aggressive, they were not of the kind that must necessarily lead to compensable physical injury. Amato's own behavior when in view of the camera approximately five minutes after the incident also could lead a jury to conclude that he was not injured by the altercation. Amato can be seen standing at the booking counter, with a casual demeanor, appearing fairly alert, and not showing signs of experiencing pain.
 
 
 20
 We note that the introduction at trial of the videotape distinguishes this case from cases such as Wheatley v. Beetar, 637 F.2d 863 (2d Cir.1980), where the Court found that the uncontradicted evidence of the victim's pain and suffering entitled him to more than nominal damages. Here, unlike in Wheatley, the jury's own perception of the victim during the incident, as well as of the incident itself, could serve to contradict Amato's claims of injury.
 
 
 21
 Apart from the videotape, the jury was presented with other evidence that could reasonably lead them to doubt the credibility of Amato's claims of injury. First, Amato provided inconsistent statements regarding his memory of the event and his injuries. For example, while he testified at trial that he remembered the booking room incident, his trial doctor testified that Amato had told him that he possessed no memory of the incident. Second, Amato testified that he felt pain in his wrist the morning following his arrest. However, he was impeached with his inconsistent deposition testimony in which he stated that his wrist began to hurt in November, 1994, months after his arrest. Furthermore, on the issue of sexual dysfunction, there was testimony that Amato's and his wife's reports of their sexual relationship may have been inconsistent with each other.
 
 
 22
 The jury could also have concluded that Amato was malingering for the purpose of winning a monetary judgment. For example, Amato admitted that, despite his pain, he sought no medical attention for his problems until at least one year, if not a year and three-quarters, after the incident. At one point he explained that "[a]t first I didn't want to go because I didn't have a lawyer. I didn't have a case."
 
 
 23
 While Amato did present the testimony of two non-treating doctors who supported Amato's claims of injuries, the jury could have reasonably been swayed by the cross-examination of these doctors. The attorneys for the appellees elicited testimony from both doctors that their diagnoses relied on Amato's description of his injuries and symptoms. In the case of Dr. Calder, his diagnosis of postconcussive injury relied, in part, on Amato's claim that he was knocked unconscious, an issue of great dispute at the trial. To the extent that the jury may have believed Amato was malingering, they could have refused to credit the testimony of doctors who relied on Amato's subjective account of his symptoms.
 
 
 24
 Alternatively, if the jury believed that Amato was suffering actual injuries, it could fairly have concluded that any such injuries arose from the difficulties Amato had experienced earlier in the day and that led to his arrest, or from the use of some measure of justified force at this arrest. Amato himself admitted to shoving his mother and throwing a bottle at his cousin prior to his arrest. Flanagan and Officer Valentine, a police officer who participated in the arrest of Amato on May 26, 1994, both testified that Amato hit and struggled with his father earlier in the day, and struggled with the police when they attempted to handcuff him. The jury could have concluded that any bruised neck, sore wrist, sore shoulder, and headache arose from these skirmishes, rather than the one in the booking room.
 
 
 25
 As to the psychological symptoms of which Amato complained, the jury was presented with evidence that Amato had other concerns that could lead to psychological problems. For example, a former police officer, Timothy Blodgett, testified that he had interviewed Amato on the day of his arrest and had completed a suicide prevention screening guideline form in regards to Amato. On the form, the officer had indicated that Amato was very worried about issues relating to finances and his spouse, and that he showed signs of depression.
 
 
 26
 Further, the jury was presented with testimony that a few of the problems of which Amato complained, namely headaches and dizziness, were symptoms he had suffered from prior to the booking room incident. Thus, the jury could have concluded that these symptoms were not proximately caused by the abuse Amato received at the hands of Flanagan.
 
 
 27
 In conclusion, the jury could reasonably have determined that Amato's testimony regarding his injuries was not credible, or that the booking room incident was not the proximate cause of any injuries from which Amato was suffering. Therefore, Amato was not entitled to compensatory damages as a matter of law, or to a new trial on the issue of damages.
 
 B. Bifurcation of the Proceedings
 
 28
 In a Memorandum, Decision and Order of July 10, 1997, Chief Judge McAvoy granted Flanagan's motion for bifurcation of the trial. See Amato v. City of Saratoga Springs, 972 F.Supp. 120, 123-24 (N.D.N.Y.1997). Specifically, he ordered that the claims against Flanagan and Thomas would be tried first, and that if the jury found liability on the part of either of the officers, trial against the City and the Police Department would immediately commence with the same jury. Amato appeals from this decision to bifurcate.
 
 
 29
 We review the district court's order to bifurcate the trial for abuse of discretion. See Vichare v. AMBAC Inc., 106 F.3d 457, 466 (2d Cir.1996). Rule 42(b) of the Federal Rules of Civil Procedure affords a trial court the discretion to order separate trials where such an order will further convenience, avoid prejudice, or promote efficiency. See Fed.R.Civ.P. 42(b). Therefore, bifurcation may be appropriate where, for example, the litigation of the first issue might eliminate the need to litigate the second issue, see Vichare, 106 F.3d at 466, or where one party will be prejudiced by evidence presented against another party, see F.R.C.P. 42(b).
 
 
 30
 In this case, either of these concerns justifies the bifurcation of the trial. First, the district court reasoned that because a trial against the City defendants would prove unnecessary if the jury found no liability against Flanagan and Thomas, bifurcation would further the goal of efficiency. The fact that the jury did actually find liability does not alter the soundness of the district court's reasoning prior to this verdict. Second, Chief Judge McAvoy noted that the plaintiff wished to introduce evidence in support of his claim against the City that would likely be either inadmissable as against Flanagan and Thomas, or prejudicial to those individual defendants. This evidence consisted in part of the personnel records of police officers, including the individual defendants, as well as a history of all claims of excessive force brought against the entire Police Department. We find these reasons to be legitimate bases for bifurcating the proceedings.
 
 
 31
 Amato's reliance on De Anda v. City of Long Beach, 7 F.3d 1418 (9th Cir.1993), is unavailing. In De Anda, a 42 U.S.C. §§ 1983 and 1985 case, the district court erred by seeking to litigate the liability of an individual defendant, who originally admitted to being present at the shooting at issue, along with the suit against the municipality, while separately trying the liability of the two other individual defendants accused of participating in the shooting. See De Anda, 7 F.3d at 1421. In the present case, no such illogical cross-categorization took place.
 
 
 32
 Finally, Amato's citation to cases where no bifurcation was ordered is entirely unpersuasive. By its very nature, discretion yields differing outcomes. For the aforementioned reasons, we find that the district court did not abuse its discretion by bifurcating the proceedings. We also note that while Amato focuses on the issue of bifurcation, it is clear that had the district court adhered to its initial determination to proceed to trial on the claim against the City and the Police Department upon a finding of liability in the first trial, bifurcation would have caused no injury to Amato. It is the district court's decision to dismiss the claim against the City defendants, rather than bifurcation, which is the critical issue to which we now turn.
 
 
 33
 C. Post-Trial Dismissal of the Claims Against the City and the Police Department
 
 
 34
 After completion of the trial against Flanagan and Thomas, the district court dismissed from the bench Amato's claims against the City and the Police Department. Amato contends that this dismissal was error.
 
 
 35
 The parties have informed us that the record is silent as to the district court's reasons for the dismissal. Post-trial, the City defendants submitted a letter motion to dismiss the Monell[4] claim, arguing, in part, that the jury's finding of nominal damages rendered the claim against the City and the Police Department moot, as the most Amato could recover would be one dollar. Given the fact that Chief Judge McAvoy had initially been prepared to go forward with the claim against the City defendants upon a finding of liability in the first trial, but dismissed the claim after the jury found no compensable damages, it appears likely that he agreed with the City defendants' argument as to the futility of proceeding when only nominal damages were at stake. We hold that, if in fact the trial judge dismissed the Monell claim because recovery would be limited to nominal damages, this was error.
 
 
 36
 As an initial matter, we note that the City and the Police Department are correct in their assertion that Amato would not be permitted to re-litigate the issue of compensable injury in the trial against the City and the Police Department. See, generally, e.g., Transaero, Inc. v. La Fuerza Aerea Boliviana, 162 F.3d 724, 731 (2d Cir.1998) (discussing collateral estoppel). Nor would Amato be able to recover punitive damages against the City defendants. See City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 259-71, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981) (holding that local government units are not subject to punitive damages in § 1983 claims). Thus, in terms of damages, Amato would be able to collect at most one dollar.[5]
 
 
 37
 While the main purpose of a § 1983 damages award is to compensate individuals for injuries caused by the deprivation of constitutional rights, a litigant is entitled to an award of nominal damages upon proof of a violation of a substantive constitutional right even in the absence of actual compensable injury. See Smith v. Coughlin, 748 F.2d 783, 789 (2d Cir.1984) (citing Carey v. Piphus, 435 U.S. 247, 253-67, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978)). Indeed, no party disputes Amato's right to the award of nominal damages in the trial against Flanagan and Thomas, given the jury's finding of liability. In fact, in their brief, the City and the Police Department endorse this award as "appropriate." Nevertheless, they argue that a suit against the City and the Police Department should not go forward where Amato stands to obtain only nominal damages against them.[6]
 
 
 38
 This position is contrary to the rationale behind permitting suits based on the deprivation of constitutional rights to proceed despite a lack of proof as to actual injury. As the Supreme Court has stated, "[b]y making the deprivation of such ['absolute'] rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed." Carey, 435 U.S. at 266, 98 S.Ct. 1042. Thus, while the monetary value of a nominal damage award must, by definition, be negligible, its value can be of great significance to the litigant and to society.
 
 
 39
 The City and the Police Department argue, however, that Amato has already "scored his victory" by obtaining nominal damages against Flanagan and Thomas. The ability to promote an individual official's "scrupulous observance" of the Constitution is important. Perhaps even more important to society, however, is the ability to hold a municipality accountable where official policy or custom has resulted in the deprivation of constitutional rights. A judgment against a municipality not only holds that entity responsible for its actions and inactions, but also can encourage the municipality to reform the patterns and practices that led to constitutional violations, as well as alert the municipality and its citizenry to the issue. In short, a finding against officers in their individual capacities does not serve all the purposes of, and is not the equivalent of, a judgment against the municipality.
 
 
 40
 To understand why this is so, some of the history of § 1983 and its relation to the principles that govern ordinary tort law must be examined. Ever since Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), it has become commonplace to compare § 1983 to a species of tort liability. See Carey, 435 U.S. at 253, 98 S.Ct. 1042 ("The legislative history of § 1983 ... demonstrates that it was intended to '[create] a species of tort liability' in favor of persons who are deprived of 'rights, privileges, or immunities secured' to them by the Constitution."). Although this analogy is not always complete, "when § 1983 plaintiffs seek damages for violations of constitutional rights, the level of damages is [thus] ordinarily determined according to principles derived from the common law of torts." Memphis Community Sch. Dist. v. Stachura, 477 U.S. 299, 306, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986); see also Smith v. Wade, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983).
 
 
 41
 The central goal of tort law is, however, to compensate persons for the injuries caused by the breach of certain commonly recognized duties. See Carey, 435 U.S. at 254, 98 S.Ct. 1042 (" 'The cardinal principle of damages in Anglo-American [tort] law is that of compensation for injury caused to plaintiff by defendant's breach of duty.' " (quoting 2 F. Harper & F. James, Law of Torts § 25.1, p. 1299 (1956))); The Special Committee on the Tort Liability System, Report to the American Bar Association, Towards a Jurisprudence of Injury 1-5 (1984) ("[T]ort law is part of a dynamic consensus on how society should deal with injuries."). With regard to the vast majority of torts, injury is thus a substantive element of the cause of action, and the amount of damages awardable is decided by the amount of injury caused. Several facts follow from this basic proposition. First, plaintiffs seeking to establish that a defendant has committed one of these torts will have their actions dismissed if they do not allege compensable injury--i.e., either because they have failed to plead all the elements of an actionable tort or because there is no relief that can be granted. Plaintiffs who plead but fail to prove injury will, moreover, be unable to establish a defendant's liability at trial, and plaintiffs who obtain adequate compensation for an injury from one joint tortfeasor will lose their causes of action against any of the other joint tortfeasors. For these reasons, if nominal damages in § 1983 actions were meant merely to "compensate" plaintiffs for "injuries" in the ordinary sense of these terms--as some of Carey 's language seems to suggest--the City defendants would have the better argument in this case.
 
 
 42
 In explaining its decision to allow for nominal damages in Carey, however, the Court stated that "[c]ommon-law courts traditionally have [also] vindicated deprivations of certain 'absolute' rights that are not shown to have caused actual injury through the award of a nominal sum of money." 435 U.S. at 266, 98 S.Ct. 1042; see also Restatement (Second) of Torts § 907 cmt. (1977). Nominal damages in these cases are, moreover, explicitly distinguished from awards granted under the same name when injury has been established for a garden variety tort but the extent of the injury remains speculative. See id. The commentaries to the Restatement explain that in the case of torts that embody "absolute" rights, nominal damages serve a different function by allowing plaintiffs to sue merely "to obtain a ruling by a court that the defendant's conduct was tortious." Id. The primary purpose of nominal damages in these cases is thus to guarantee that a defendant's breach of these duties will remain actionable regardless of their consequences in terms of compensable damages.
 
 
 43
 These distinctions are important because the Court in Carey premised its decision to allow for nominal damages on a finding that violations of procedural due process are properly analogized not to ordinary torts but to torts of this latter "absolute" kind. Since Carey was decided, we have, moreover, clarified that its principle extends not only to procedural but to substantive constitutional rights. See Ruggiero v. Krzeminski, 928 F.2d 558, 563-64 (2d Cir.1991); Smith v. Coughlin, 748 F.2d 783, 789 (2d Cir.1984). Carey and its progeny are thus best viewed as clarifying that plaintiffs suffering constitutional violations can establish a defendant's liability through § 1983 even if an analogous state law tort would be dismissed for lack of compensability.
 
 
 44
 For these reasons, we need not worry that Amato has already "scored his victory" or that our present holding otherwise runs afoul of the principle disallowing duplicative awards. See, e.g., Bender v. City of New York, 78 F.3d 787, 793-94 (2d Cir.1996) (holding that plaintiffs who have suffered actual injury cannot obtain compensatory damage awards from a defendant if they have already obtained an award that fully compensates them for the injury from another defendant). First, as the above discussion demonstrates, there is a real question as to whether nominal damages can ever be strictly "duplicative" in the present context because they are meant to guarantee that unconstitutional acts remain actionable rather than to "measure" the constitutional injury in any meaningful sense (or to serve as a replacement for speculative damages). Moreover, if the district court had not bifurcated Amato's trial, and if Amato could establish the City defendants' joint liability, then under Carey he would have had the right to obtain a judgment for nominal damages against both the individuals and the City defendants in this case. We see no reason to think that the court's decision to bifurcate should extinguish that right. Nor do we think that Amato's interest in obtaining a judgment against the City defendants was fully vindicated when Amato obtained a verdict against some of the individuals in this case.[7]
 
 
 45
 Our decision today is also consistent with our earlier opinion in Gentile v. County of Suffolk, 926 F.2d 142 (2d Cir.1991). In Gentile, plaintiffs brought an action against the County of Suffolk and several of its officers for violating their constitutional rights. The jury returned a verdict finding both the County and the individual officers liable and finding that the violation resulted in actual injury. The jury entered the entire compensatory damages award against the County of Suffolk, however, and no damages against the individual defendants. On appeal, the plaintiffs argued that they deserved nominal damages from the individual defendants because they were found jointly liable for the violation. We held that Carey did not require an award of nominal damages against the individuals under these circumstances, however, explaining, in part that the actual injury had already "been compensated by the jury's award of damages." Id. at 155. Gentile differs from the present case in a crucial respect, however, because in Gentile the plaintiff had already obtained not only an award that compensated him fully for all of his compensable injury but a final judgment declaring the liability of all of the defendants who had participated in the relevant constitutional violation. There was thus no danger that the plaintiffs' claim against any particular wrongdoer would be dismissed--as occurred below--or that any wrongdoer's breach would be rendered nonactionable.
 
 
 46
 In holding that Amato should not lose his right to proceed against the City defendants because only nominal damages are at stake, we agree in part and disagree in part with the decision of the Ninth Circuit in George v. City of Long Beach, 973 F.2d 706 (9th Cir.1992). In George, the court, when faced with similar circumstances, held that the district court erred when it failed to instruct the jury that it must--as opposed to could--award nominal damages if the jury found a violation of the plaintiff's rights but no actual damages. See id. at 708. In particular, the court emphasized the need for "symbolic vindication" of violations of constitutional rights. See id.; see also Larez v. City of Los Angeles, 946 F.2d 630, 640 & n. 4 (9th Cir.1991) (discussing the importance of vindicating constitutional rights, even through symbolic awards).[8] The court then proceeded to hold that any error by the district court in dismissing the Monell claims was harmless. See id. at 709. Our agreement with the first part of the Ninth Circuit's decision compels our disagreement with the second. Precisely because nominal damages afford a litigant vindication of the deprivation of his constitutional rights, the decision to dismiss a plaintiff's claim against a municipality because only nominal damages are at stake is error.
 
 
 47
 Our holding today is informed, in part, by the frequent bifurcation of proceedings where a plaintiff has initiated a § 1983 action against individual officials and municipal entities. Section 1983 actions are particularly well suited for bifurcation because the evidence needed to show a "policy and custom" on behalf of the municipal entity is often unnecessary in the suit against the individual official. Furthermore, if a plaintiff fails to show that a constitutional violation occurred in the suit against the individual official, the corresponding cause of action against the municipality will be mooted since a claim of negligent training is only actionable where some constitutional violation actually occurred. See City of Los Angeles v. Heller, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986). For these reasons, trial courts will, with some frequency, exercise their discretion pursuant to Rule 42(b) of the Federal Rules of Civil Procedure and sever the proceedings. While such severance is often appropriate in terms of judicial efficiency, if the Monell portions of such actions were to be dismissed when only nominal damages are at stake against the municipal entities, bifurcation in these § 1983 cases would have an unintended, and at times unfortunate, consequence.
 
 
 48
 Where trial of a Monell claim has been deferred to follow a trial against an individual official, three scenarios are likely to result: the jury finds that the officer is liable and awards actual damages; the jury finds that the officer is liable and awards nominal damages; or the jury finds that the officer is not liable. Were we to adopt the City defendants' position on Monell claims and nominal damages then each scenario would result in dismissal of the Monell claims where the plaintiff's allegations against the individual official formed the sole basis for the "policy and custom" cause of action against the municipality.[9] For example, if a jury were to find the officer liable and award damages that would fully compensate the plaintiff, the principle barring duplicative awards would prevent the litigant from thereafter seeking compensatory damages against the municipality, and, therefore, only nominal damages would be stake. If, alternatively, a jury were to award nominal damages against the officer, once again the most the plaintiff could obtain against the municipality would be one dollar, and the appellees would have us dismiss. Finally, if the jury were to determine in the first phase that no constitutional injury occurred, then the municipality could not be held liable,[10] so the Monell claims would be dismissed.
 
 
 49
 Because bifurcation is an important tool, yet should not constitute a barrier to suits against municipalities, and because a litigant is entitled to seek symbolic vindication from the municipality as well as the individual official for violation of constitutional rights, we hold that dismissal of Amato's Monell claim, if based on the fact that only nominal damages would be recoverable, was error, and was not harmless.[11]
 
 
 50
 For the aforementioned reasons, we vacate the district court's judgment dismissing Amato's claim against the City and the Police Department, and remand for reconsideration in accordance with this opinion. If the district court determines that Amato's Monell claim should proceed, the City and the Police Department should be afforded the choice to consent to judgment and payment of nominal damages. Nothing in this opinion should be interpreted to preclude the district court from dismissing Amato's claim on a basis separate from the nominal damages issue, as the court below did in a related case, see Amato v. City of Saratoga Springs, No. 97-cv-1443, 1998 WL 903625 (N.D.N.Y. Dec.23, 1998). If the district court initially dismissed Amato's claim in the present action for grounds entirely distinct from the issue of nominal damages, on remand the court should state its reasoning.
 
 
 51
 D. The District Court's Grant of Summary Judgment to King
 
 
 52
 Amato contends that the district court erred in awarding summary judgment to King on Amato's § 1983 claim against King in his individual capacity.[12] We review de novo a district court's decision to grant summary judgment. See Ayers v. Ryan, 152 F.3d 77, 80 (2d Cir.1998). Summary judgment may be granted only if there is no genuine issue of material fact in dispute. See Adams v. Dep't of Juvenile Justice, 143 F.3d 61, 65 (2d Cir.1998). When reviewing whether summary judgment was appropriate, "we resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir.1997).
 
 
 53
 We affirm for substantially the reasons stated by Chief Judge McAvoy in his Memorandum, Decision and Order of July 10, 1997. See Amato v. City of Saratoga Springs, 972 F.Supp. 120, 124-26, 127-29 (N.D.N.Y.1997). In short, Amato failed to raise a genuine issue of material fact as to King's lack of personal involvement in the deprivation of Amato's constitutional rights. Having examined all of Amato's contentions and having found them without merit, we affirm the judgment of the district court awarding summary judgment to King.
 
 CONCLUSION
 
 54
 We vacate the district court's dismissal of Amato's claim against the City and the Police Department, and remand the issue for reconsideration in accordance with this opinion. In all other respects, we affirm the district court.
 
 JACOBS, Circuit Judge, concurring:
 
 55
 I subscribe to the portions of the majority opinion that affirm the district court's (1) denial of a new trial following the award of nominal damages; (2) bifurcation of the proceeding; and (3) dismissal of the plaintiff's claim against Police Chief King in his personal capacity. As to the remand so that the district court can address the plaintiff's Monell claim against the municipal defendants, I concur in the result but I do not subscribe to the majority opinion.
 
 
 56
 The plaintiff brought this § 1983 action against Sergeant Flanagan and Lieutenant Thomas ("the individual officers"), as well as against the City of Saratoga Springs and the Saratoga Springs Police Department ("the municipal defendants"), alleging among other things, that Flanagan had used excessive force during a post-arrest altercation between the plaintiff and the individual officers. The plaintiff sought $3 million in compensatory damages and $10 million in punitive damages. The district court bifurcated the trial, the first phase to address the claims against the individual officers, the second, the claims against the municipal defendants.
 
 
 57
 At the conclusion of the first phase, the jury found that the individual officers had indeed violated the plaintiff's civil rights, but that the plaintiff suffered no compensable injury, and awarded punitive damages only. That aspect of the judgment is now affirmed. The majority opinion then remands the action to the district court for the second phase, the claims against the municipal defendants. In that proceeding, punitive damages will be unavailable as a matter of law, see City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271, 101 S.Ct. 2748, 2762, 69 L.Ed.2d 616 (1981), and compensatory damages are barred by the estoppel effect of the nominal damages verdict in the first phase of trial. The plaintiff's recovery in the second phase is therefore capped at one dollar.
 
 
 58
 The majority opinion justifies the supposed need for a second trial--notwithstanding the plaintiff's inability to recover more than one dollar--on the ground that a judgment against the municipal defendants "can be of great significance to the litigant and to society." See Majority Opinion at [page 317]. I can agree that a remand is necessary--there is no ground in the record for dismissing the claims against the municipality--and I concur in the result. On this issue, however, I decline to subscribe to the majority opinion because the benefit it envisions is a wasteful imposition on the trial judge and on the taxpayers and veniremen of Saratoga Springs, and because in announcing such a result we should acknowledge the seemingly wasteful consequences, and should point out the principles of law (referenced by footnote in the majority opinion) that are available to avoid those consequences altogether.
 
 
 59
 The majority characterizes the litigation on remand as plaintiff's opportunity to show that the municipal defendants played a role in the violation of his civil rights, a finding that would have intrinsic worth irrespective of the amount of any accompanying monetary award. Whatever benefit the majority envisions, however, the trivial amount at issue in the Monell trial virtually assures that a loss by the municipality would have no collateral estoppel effect. See Parklane Hosiery Co. v. Shore, 439 U.S. 322, 330-31, 99 S.Ct. 645, 651-52, 58 L.Ed.2d 552 (1979). It is therefore just as likely that a second trial would benefit the plaintiff only as an act of spite designed to inflict expense on the municipality and compel deference and attention to himself.
 
 
 60
 If the case on remand were to require a second trial, a federal judge would have to expend days of judicial labor, and the plaintiff's peers would be commanded to serve as jurors and set aside employment, family commitments, leisure and (more useful) volunteer activities. Many thousands of dollars would be expended to defend this one-dollar lawsuit, money that the citizens of Saratoga Springs may judge better spent on a school crossing-guard or a part-time music teacher. These burdens on the court, and on the taxpayers of the City of Saratoga Springs and its good veniremen would outweigh--hands down--the benefits of remand that the majority opinion identifies.
 
 
 61
 The ruling in this case does not entail such perverse and wasteful consequences, as the majority opinion impliedly acknowledges by footnote. See Majority Opinion at [page 321, note 11]. On remand, the defendants can default, allow the district court to enter judgment against them, and pay the dollar to the vindicated and happy plaintiff. Moreover, the municipal defendants can do so without fear that they might suffer collateral consequences:
 
 
 62
 * As the majority opinion points out in another footnote, "nominal damages can be grounds for denying or reducing an attorney's fee award." See Majority Opinion at [page 317, note 5]; see also Farrar v. Hobby, 506 U.S. 103, 115, 113 S.Ct. 566, 575, 121 L.Ed.2d 494 (1992) ("When a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief, the only reasonable fee is usually no fee at all." (citation omitted)).
 
 
 63
 * And of course a default judgment lacks preclusive effect in other litigation. See Abrams v. Interco Inc., 719 F.2d 23, 33 n. 9 (2d Cir.1983); Restatement (Second) of Judgments § 27 cmt. e, at 257 (1982); 10 James Wm. Moore et al., Federal Practice § 55.50[a], at 55-67 to 55-68 (3d ed.1998).
 
 
 
 *
 Honorable Leonard B. Sand, of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 Thomas is now deceased. The district court appointed Karen Thomas as personal representative of Thomas for the purposes of this action
 
 
 [2]
 The jury awarded $20,000 in punitive damages. This amount was later reduced by Chief Judge McAvoy to $15,000
 
 
 [3]
 Immediately after the altercation with Flanagan, Amato drops out of the view of the camera for a few minutes, although his handcuffed arm can still be seen
 
 
 [4]
 See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (holding that local government units may be sued pursuant to 42 U.S.C. § 1983)
 
 
 [5]
 The City and the Police Department contend that plaintiff-appellant and counsel may be improperly motivated by a desire for an attorney's fee award. Because we hold for reasons independent of any possible entitlement to attorney's fees that the district court should reconsider whether to allow Amato to proceed against the City and the Police Department, we do not address this issue. We do note that a nominal damage award can be grounds for denying or reducing an attorney's fee award. See, e.g., Farrar v. Hobby, 506 U.S. 103, 113-15, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992). However, the impact of an award of nominal damages on Amato's right to legal fees is a matter for the district court in the first instance
 
 
 [6]
 A plaintiff is, of course, under no compulsion to proceed to the second phase of the trial if only nominal damages and legal fees are at stake, but this is a matter for a plaintiff to decide. We were advised at oral argument by counsel that Amato would wish to proceed in this case if permitted to do so
 
 
 [7]
 It might present a harder question if we had to decide whether it would violate the principle against duplicative awards to allow plaintiffs to bring separate actions for nominal damages against several defendants who have all participated in one constitutional violation, rather than one action for joint and several liability. The plaintiff in this case, however, brought only one action, which was bifurcated for reasons wholly extrinsic to the merits of his claim
 
 
 [8]
 Several of the decisions in the Ninth Circuit regarding Monell claims are worthy of note. In Sanchez v. City of Riverside, 596 F.Supp. 193 (C.D.Cal.1984), the district court granted a motion for summary judgment in favor of Riverside following a finding of liability against an individual officer in the first phase of the trial. See id. at 194-95. The court reasoned that where the City agreed to pay the judgment that was entered against the individual officer, and where the plaintiff did not claim any wrongs by the City distinct from that of the individual officer, proceeding to trial against the City was futile. See id. The court noted that the judgment would incorporate the City's agreement to be liable for the award. See id. at 196
 This decision was brought into question by Larez v. City of Los Angeles, 946 F.2d 630 (9th Cir.1991). In that case, the Court of Appeals for the Ninth Circuit decided the district court had appropriately proceeded to the second phase of trial against the City of Los Angeles and Gates, the police chief, after a finding of liability against individual officers in the first phase of the trial. See id. at 640-41. The court reasoned that because plaintiffs had alleged separate and distinct constitutional wrongs against the City and Gates and because Carey emphasized the importance of vindicating absolute rights, the plaintiffs were entitled to proceed even though they could only obtain nominal damages against the City, and punitive damages against Gates in his individual capacity. See id. The court also noted, but did not hold, that the importance of symbolic vindication of constitutional rights may have necessitated proceeding with the second phase of the trial even if the plaintiffs had not alleged separate and distinct wrongs by the City and Gates. See id. at 640, n. 4.
 Surprisingly, George, discussed above, followed soon after Larez, holding that dismissal of the Monell claims was harmless error. See George, 973 F.2d at 709. In a recent case, Ruvalcaba v. City of Los Angeles, 167 F.3d 514 (9th Cir.1999) the Ninth Circuit appeared to rely on the fact that the plaintiff had alleged separate and distinct wrongs against the City and Gates in its decision to reinstate the plaintiff's claims against them. See id. at 523-24. The district court had dismissed these claims following a finding of excessive force against the individual officer.
 As is discussed above, this Court adopts the position that the Ninth Circuit intimated in Larez--that the importance of vindicating constitutional rights requires permitting a plaintiff to proceed against the municipality, despite the fact that only nominal damages are at issue.
 
 
 [9]
 A plaintiff could raise claims of wrongdoing against the municipality that are separate and distinct from the allegations against a named individual defendant. In such a case, the Monell claims could survive bifurcation because the findings and awards against the individual would not moot the claims against the municipality. See, e.g., Larez, 946 F.2d at 640 (holding that it was proper to proceed to the second phase of the trial because plaintiff alleged that the City of Los Angeles and the police chief had committed separate and distinct constitutional violations from those committed by the individual officers). In light of the important goals a finding of liability against the municipality can serve, we decline to hold that a plaintiff must allege separate and distinct wrongdoing against the municipality before he may proceed to trial on his Monell claims
 
 
 [10]
 But see infra note 9
 
 
 [11]
 Just as Amato may have an inducement not to proceed with a suit against the City in order to recover nominal damages, see footnote 5, supra, the City defendants, if faced with Amato's Monell claim, might decide to default or to consent to judgment and pay the nominal damages. The existence of these options addresses the potential concern that the cost involved in hearing Amato's claim against the City and the Police Department outweighs any societal interest in allowing Amato to pursue a claim that can only yield a judgment and one dollar in damages. The determination whether the opportunity to vindicate the reputation of the Department would offset the economic costs is one for these defendants to make. We were told at oral argument that a Rule 68 offer of judgment had been made prior to trial, see also Amato v. City of Saratoga Springs, 991 F.Supp. 62, 68 (N.D.N.Y.1998), suggesting that economic concerns may indeed be paramount
 
 
 [12]
 To the extent that Amato sought a cause of action against King in his official capacity, the district court dismissed any such claim as redundant to Amato's claims against the City. See Amato v. City of Saratoga Springs, 972 F.Supp. 120, 126 (N.D.N.Y.1997). Amato's briefs suggest that he does not appeal this dismissal, but, rather, only appeals the grant of summary judgment to King in his individual capacity. (See Appellant's Br. at 8.)